IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHANIE GOODMAN,<br>            Plaintiff, | CIVIL ACTION |
| v. | |
| NORRISTOWN AREA SCHOOL DISTRICT,<br>            Defendants. | NO.  20-1682 |

## MEMORANDUM OPINION

This employment discrimination and retaliation suit concerns disputes between high-school Spanish teacher Plaintiff Stephanie Goodman, and her former employer, Defendant Norristown Area School District ("the School District").  Goodman brings claims of: (1) discrimination under Title VII of the Civil Rights Act of 1964 and 1991 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-29; and, (2) retaliation under Title VII and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-63.  The School District moves for summary judgment on all Plaintiff's claims.  For the reasons that follow, its motion shall be denied with respect to Plaintiff's discrimination claims but shall be granted with respect to her retaliation claims.

I.      BACKGROUND[1]

Plaintiff is an African American woman, currently in her sixties, certified to teach Spanish in Pennsylvania.  During the relevant period, she was the only African American and part-time teacher in the World Languages Department at Norristown Area High School.  Three events, as described in greater detail below, underpin her claims:  (1) her demotion and failure to be hired and/or promoted to a full-time Spanish teacher position in August 2016; (2) retaliation

---

[1] Unless otherwise noted, the following facts are undisputed between the parties.

1

for her October 2016 complaints regarding disparate access to textbooks and classrooms; and, (3) retaliation for an administrative complaint she made to the Pennsylvania Human Relations Commission ("PHRC") as well as for a grievance she filed and arbitrated pursuant to the collective bargaining agreement between the School District and its teachers' union.

Plaintiff's discrimination claims are premised on the following series of events: In spring 2014 she applied through the "PA REAP" website (a portal used by Pennsylvania Public Schools to recruit teachers) to be hired as a Spanish teacher. One week later, the School District hired her as a "Per Diem Substitute Spanish Teacher" for the remainder of the school year in the Norristown Area High School (the "High School"). Once employed, in rapid succession she was offered and accepted three different teaching positions at the High School: she was hired to continue as a "Per Diem Substitute Spanish Teacher," then hired for the positions of ".4" part-time Spanish teacher and building substitute, and finally hired as a ".8" part-time Spanish teacher, a role which came with a salary increase and additional benefits. She did not submit a new application or interview for any of these new roles.

Two or so years later, the Principal and Assistant Principal of the High School told Plaintiff that "there was a possibility of [her] contract being decreased" because of budget cuts and decreased enrollment. The next month, two "1.0" full-time Spanish teachers resigned, and Defendant posted openings to fill their now vacant positions. The posting was online for ten days on a website called "Recruit and Hire"— a site different from the one Plaintiff used to submit her original application. Plaintiff did not apply, and Defendant ultimately hired two Latina women who are both younger than Plaintiff. It is undisputed that Plaintiff would have been qualified for the full-time positions, though the Parties dispute whether one of the two women ultimately hired was certified to teach in Pennsylvania and therefore qualified for the

position.

During the application window, Defendant mailed Plaintiff a letter which informed her that her employment would be changed to a .4 Spanish teacher position because of decreased enrollment and budget cuts.  The change in her status resulted in a salary decrease and a loss of certain benefits.[2]  In an affidavit and at her deposition, Plaintiff stated that she would have applied had she known about the open positions but did not look for any jobs with Defendant because she had been told about the impact of the budget cuts.  Once she learned the jobs had been posted and filled, Plaintiff filed her grievance under the collective bargaining agreement challenging Defendant's "failure to assign her to one of the available full-time positions."  The grievance was arbitrated.  She lost because she did not have tenure.  Here, her Title VII and the ADEA legal claims are based on her contention that the School District did not hire and/or promote her to the open positions because it "preferred to hire [younger] Hispanic women."

Plaintiff's retaliation claims are based on two separate incidents.  The first concerns a complaint she made to the Assistant Principal at the beginning of the 2016-17 school year in which she told him about her concerns that she was being discriminated against for her race and age because younger, non-African American language teachers were provided with better resources than she was.  Specifically, the other teachers had their own classrooms and workspaces, and their classes had their own textbooks while Plaintiff did not have an individual workspace and had to share textbooks with other teachers.

After she complained, the Assistant Principal advised her to include students who had individual education plans ("IEPs") in her "student learning objectives" ("SLO") reports.  These reports are designed to measure "educator effectiveness based on student achievement of content

---

[2] Defendant disputes that the reduction in Plaintiff's position resulted in a loss of benefits.

3

standards." Plaintiff contends that because she included the special education student's IEPs in her reports, her performance ratings were lowered.

When she learned that her colleagues excluded IEP students in their SLO reports, which meant that their SLO scores were higher than hers,[3] she again complained to the Assistant Principal. Sometime thereafter, the Chair of the World Languages Department at the High School sent a department-wide email advising teachers to include students with IEPs in their SLO reports per the Assistant Principal's instructions. Plaintiff claims that the Assistant Principal retaliated against her by instructing her to include students with IEPs in the SLO reports in violation of Title VII. Ultimately, however, she received a performance review of "Satisfactory" for the school year.

The second incident underpinning Plaintiff's retaliation claims stems from an administrative complaint she filed with the Pennsylvania Human Relations Commission ("PHRC Complaint") regarding her inclusion of students with IEPs in her SLO report, and the union grievance she took to arbitration. She testified that at the beginning of the following school year, various administrators and counselors employed by the School District solicited complaints about her performance from students and parents, including from students she did not teach.[4] In an affidavit, Plaintiff specifically notes that two counselors instructed students whom Plaintiff had sent to the disciplinary office to file written complaints against her. Plaintiff also testified that students and their family members alerted her that they had been asked to write negative

---

[3] Defendant disputes that the Plaintiff was singled out with the IEP instruction; it maintains that all language teachers at the High School were advised by email to include IEPs in their SLO reports.

[4] Defendant disputes that it solicited complaints about Plaintiff's performance. The High School's Principal submitted an affidavit in support of the School District's motion describing a policy whereby any student who communicates a complaint about teacher is advised to put their complaint in writing. He then receives the written complaint and determines what further steps, if any, need to be taken.

statements and answer questions about her. Although the Principal met with Plaintiff to discuss the student complaints, she was not formally reprimanded.

Around the same time, School District administrators conducted unannounced visits and reviews of Plaintiff's classes; Plaintiff testified that they did not do the same (or conducted them less frequently) for other language teachers.[5] She also testified and swore in an affidavit that Defendant further retaliated against her by instructing the school secretary to prevent her from signing in for work on three dates in October of the 2017-18 school year.[6]

Together, Plaintiff views these actions as constituting retaliation under Title VII and the PHRA.

## II. STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted); Fed. R. Civ. P. 56(c). A fact is material where it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). The moving party bears the burden of showing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

---

[5] Two administrators have submitted affidavits in support of Defendant in which they state that the High School is required to conduct these unannounced visits and reviews by the Pennsylvania School Code, and that all teachers at the High School were in fact subjected to these visits and reviews. Plaintiff does not dispute that Defendant was required to conduct unannounced visits for all teachers, but disputes that these visits were actually conducted for other teachers and that other teachers "were [not] treated the same way with the walk-throughs."

[6] Defendant has submitted an affidavit from the school secretary in which she states that these were all inadvertent mistakes. In a separate affidavit and at her deposition, however, Plaintiff maintains these acts were intentional and part of a larger retaliatory scheme.

The non-moving party "may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256.  In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted).  "Summary judgment is to be used sparingly in employment discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)

### III.   DISCUSSION

#### a.  Discrimination Claims

Defendant argues that—given her grievance arbitration—Plaintiff's discrimination claims are barred by res judicata.  This argument is unpersuasive.  Both the Supreme Court and the Third Circuit have held a prior arbitration pursuant to a collective bargaining agreement, such as the one here, does not bar employees from subsequently bringing civil rights claims under Title VII and the ADEA in federal court. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 (1974); *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 825-26 (3d Cir. 1991).  In *Alexander*, finding that "Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement," the Supreme Court reasoned that arbitration was an inappropriate forum to adjudicate civil rights, and thus could not bar such claims from being subsequently heard in federal court.  415 U.S. at 56-57.  It relied on both Congress's intent in passing Title VII, the expertise and comparative procedural mechanisms available in each forum and explained, "[a]rbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final

resolution of rights created by Title VII. . . . We think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII. . . ." *Id.* at 56-60.  Thus, res judicata does not foreclose Plaintiff's claims here.

Defendant next argues that Plaintiff has failed to adduce sufficient evidence to make out a discrimination claim under Title VII and the ADEA.  Her claims proceed under a disparate impact theory:  specifically, that she was singled out and treated less favorably than others based on her race and age.  *Texas Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 253-56 (1981); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698, 701 (3d Cir. 1995) (explaining that ADEA claims follow the same procedural framework as Title VII claims).  Disparate treatment violations under both Title VII and the ADEA are assessed under the *McDonnell Douglas* tripartite burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972) ("*McDonnell Douglas*").  The first stage requires Plaintiff to establish a prima facie case of discrimination.  *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999).  The second stage shifts the burden back to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection[,]" *id.*(internal quotations omitted), and the third volleys the burden back to the plaintiff to prove that the reasons offered by the defendant were a pretext for discrimination, *i.e.*, "a fiction which obscures the reality of discrimination." *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 914 (3d Cir. 1983).

To make out a prima facie case of failure to hire or promote under Title VII and the ADEA, Plaintiff must show that: (1) she belongs to a protected class; (2) she applied for and was qualified for a job; (3) she was subject to an adverse employment action despite being qualified;

and, (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with similar qualifications to fill the position. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802 (1973)). The burden of establishing a prima facie case is "not intended to be onerous," *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), and is "easily made out." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

Defendant contends that Plaintiff has not introduced evidence sufficient to establish that she suffered an adverse employment action or that the circumstances raise an inference of discrimination. Its argument hinges on the fact that Plaintiff failed to apply for the full-time Spanish teacher jobs.

The "adverse employment action" element of a prima facie case of discrimination requires a "significant change in employment status, such as hiring, firing failing to promote, reassigning with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Barnes v. Nationwide Mut. Ins. Co.*, 598 Fed. App'x 86, 90 (3d Cir. 2015) ("Termination, failure to promote, and failure to hire all constitute adverse employment actions." (citing 42 U.S.C. § 2000e-2(a)(1)). Although courts generally (and logically) require that plaintiffs have applied for a position before they may sue for failure to be hired or promoted to that position, *see, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004), the Third Circuit and Supreme Court have consistently held that the prima facie test under the *McDonnell Douglas* framework should not be applied in a "rigid, mechanized, or ritualistic" manner and that it is not necessarily an invariable scheme. *See E.E.O.C. v. Metal Servs. Co.*, 892 F.2d 391, 347 (3d Cir. 1990). Indeed, certain well-recognized

8

exceptions excuse a plaintiff's failure to apply for an open position. *See id.* at 348-50; *Newark Branch, N.A.A.C.P v. Town of Harrison, N.J.*, 907 F.2d 1408, 1415 (3d Cir. 1990) ("*N.A.A.C.P.*"). Specifically, a plaintiff's claim is not doomed by her failure to apply for a position if she shows that she made every reasonable attempt to convey her interest in the position to her employer, *E.E.O.C.*, 892 F.2d at 348, or was deterred for applying for the position because of her employer's discriminatory practices and would have applied but for those practices, *N.A.A.C.P.*, 907 F.2d at 1415 (internal citation omitted), or had a real and genuine interest in the position but reasonably believed that a formal application would be futile. *Id.* Moreover, where the record shows that an employer used both informal and formal application processes to hire or promote employees, what constitutes an "application" becomes a question of fact. *See, e.g.*, *McFadden v. Whole Foods Mkt. Grp., Inc.*, 2021 WL 736899, at * 6 (E.D. Pa. Feb. 25, 2021).

Viewing the record through this framework and in the light most favorable to Plaintiff, there remain disputed issues of material fact which preclude summary judgment. In her sworn deposition testimony and affidavit Plaintiff states that she did not believe the School District would be hiring full-time teachers because she had—twice—been told by school administrators that budget cuts and decreased enrollment had forced them to demote her. The parties dispute whether a part-time teacher would have needed to apply for the full-time positions[7] but they

---

[7] Defendant relies on two opinions which they interpret to mean that Plaintiff has not met her prima facie burden because she did apply for the positions. Quite apart from the concern that neither of them is precedential (one is a district court case, the other an unpublished Third Circuit opinion) they are also distinguishable. In both cases, it was undisputed that the plaintiffs knew of the job openings they sought and how to apply for them, but nevertheless, intentionally chose not to take steps to apply for them. *See McLintock v. City of Phila.*, 504 F. Supp. 3d 411, 423 (E.D. Pa. 2020) (holding that plaintiff failed to make a prima facie case because she did not apply to the position, which was common knowledge and she had known of for years, because it was not publicly posted); *Bates v. Tandy Corp.*, 186 Fed. App'x 288, 293-94 (3d Cir. 2006) (holding that plaintiffs failed to establish a prima facie case because they did not apply for the open position, and expressly declined to take the first step in the application process for the position.).

agree that although she only ever submitted one application (through the PA REAP portal) once hired by Defendant she was offered and accepted at least two different positions without having to submit a new or supplemental application. Based on this prior practice, whether a full-time position is, in fact, handled differently than a part time position is a disputed question of material fact left for the jury to determine. *McFadden*, 2021 WL 736899, at *6. Therefore, whether viewed as a failure to promote or as a failure to hire, a reasonable jury could find that Defendant's decision not to select Plaintiff for the open full-time position constituted an adverse employment action, even though she did not submit an application. *See, e.g.*, *Selvanathan v. Opportunities Industrialization Ctrs. Int'l*, 871 F. Supp. 2d 349, 362 (E.D. Pa. 2012).

In an effort to satisfy its burden under the second stage of the *McDonnell Douglas* framework Defendant points to Plaintiff's failure to apply for the positions as a legitimate, non-discriminatory reason for its failure to promote her. But once again, Defendant's past practice assigning Plaintiff different positions without requiring new applications undermines this position, such that a reasonable jury could find it pretextual.

      **b. Retaliation Claims**

Plaintiff's retaliation claims are also governed by the tripartite *McDonnell Douglas* framework.

A prima facie case of retaliation under Title VII requires a showing that: (1) Plaintiff engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complains to management; (2) she was subjected to an adverse action by the employer either after or contemporaneous with the employee's protected activity; and, (3) there is a causal connection between the protected activity and the adverse action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). As with her

discrimination claims, Defendant's challenge to Plaintiff's retaliation claims is that she suffered no adverse action.

An "adverse action" in the context of a retaliation claim under Title VII encompasses a broader variety of conduct than an "adverse action" for purposes of a discrimination claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington N.*" or "*Burlington Northern*"). As noted above, an adverse action under Title VII's antidiscrimination provision requires a showing that the complainant suffered a significant or tangible change in her employment status, such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or a decision causing a significant change in benefits. *Burlington Indus., Inc.*, 524 U.S. at 761. By contrast, *Burlington Northern* establishes that an adverse action in the context of a retaliation claim requires that the action be "materially adverse" in the eyes of a reasonable employee, meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68.

The "materiality" requirement is included so as to "separate significant from trivial harms." *Id.* at 68. In other words, Title VII does not create "a general civility code for the American workplace" and accordingly, does not impose liability for "those petty slights, minor annoyances that often take place at work and that all employees experience." *Id.* The standard for judging harm therefore remains objective, so as to "avoi[d] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69.

Nonetheless, some degree of the analysis is still context-dependent. It "depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 69

(internal quotations omitted).  For example, "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination" whereas a change to an employee's work-schedule, or a supervisor's refusal to invite an employee to lunch would not qualify as "materially adverse" absent evidence of some extenuating circumstance.  *Id.*

Thus, while the bar for what qualifies as an adverse action for retaliation is set lower than other claims under Title VII, every allegation or slight will not clear this hurdle.  In *Burlington Northern*, the Supreme Court provided examples of retaliatory actions that qualified as materially adverse, which included changes that had an "enormous" impact on an employee's ability to work, exclusion from professional advancement opportunities, and re-assignment to less prestigious duties.  *Id.* at 69, 71.  The common thread connecting these examples is that the complainant in each suffered some sort of harm or injury to her professional advancement.  *Id.*  Absent evidence to show that the alleged retaliatory action affected a plaintiff or her professional standing, the action cannot be "materially adverse" within the meaning of Title VII's antiretaliation provision as it would not "dissuad[e] a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68.  Without more, the action amounts to only an irremediable "petty slight" or "trivial inconvenience."  *See, e.g.*, *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 799 (3d Cir. 2010) (affirming grant of summary judgment because a transfer which resulted in a slightly longer commute was a "trivial harm," not an "adverse action").

Against this legal framework, and after viewing all the facts and drawing all reasonable inferences therefrom in Plaintiff's favor, she has failed to establish that her inclusion of IEPs in her SLO report constitutes a retaliatory "adverse action" within the meaning of Title VII.  Even

assuming Plaintiff was told to include IEPs in her reports before her peers were told to do the same, it is undisputed that eventually all the language teachers were instructed to include them in their SLO reports. And even assuming that Plaintiff's SLO scores were lower than that of her peers, there is nothing in the record to suggest that any negative employment review or action resulted from those scores. It is undisputed that Plaintiff only had one performance review that year, that she received a grade of "Satisfactory," and that she was not subject to any review or scrutiny based on her performance.

Plaintiff also contends that the School District retaliated against her following her filing of her PHRC Complaint and her collective bargaining agreement grievance by making it difficult for her to sign in to work on three dates, subjecting her to unannounced classroom visits and reviews more frequently than her peers, and soliciting student complaints about her performance in violation of Title VII and the PHRA. *Daniels*, 776 F.3d at 192-93 (3d Cir. 2015) (treating PHRA and Title VII retaliation claims as identical). Once again, Defendant moves for summary judgment against this claim because Plaintiff has not submitted sufficient evidence that she suffered any professional repercussions as a result of its actions. There is nothing in the record to suggest that any of these concerns of Plaintiff resulted in an adverse employment action. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (holding that discrepancies and allegations that someone tampered with time sheets are "too petty to serve as evidence of retaliation."); *Boykins v. SEPTA*, 722 Fed. App'x 148, 159 (3d Cir. 2018) (holding that "criticism, false accusations or verbal reprimands," such as the student complaints here, do not constitute adverse actions (quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003)); *Baker v. City of Phila.*, 2009 WL 3579815, at * 8 (E.D. Pa. Oct. 27, 2009) (holding that increased scrutiny of a plaintiff's work, such as the classroom visits here, "essentially amounts to scolding"

and does not meet the materiality threshold set by *Burlington Northern*). Without this, her retaliation claim cannot proceed further.

### IV.  CONCLUSION

In light of the foregoing, summary judgment shall be denied on Plaintiff's discrimination claims but granted on her retaliation claims.

An appropriate order follows.

**BY THE COURT:**

/s/Wendy Beetlestone, J.

**WENDY BEETLESTONE, J.**